UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERIK WILLIAM HOFFSCHNEIDER,

Plaintiff,

v.

NANCY A. BERRYHILL,[1]

Defendant.

Case No. 16-cv-07383-DMR

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 14, 17

Plaintiff Eric William Hoffschneider ("Hoffschneider ") moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found that Hoffschneider was not disabled and therefore denied his application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Commissioner cross-moves to affirm. For the reasons stated below, the court denies Hoffschneider's motion and grants the Commissioner's cross-motion.

I.     **PROCEDURAL HISTORY**

Hoffschneider filed an application for Social Security Disability Insurance (SSDI) benefits on May 8, 2013, alleging that he has disabling conditions related to his back that began on December 29, 2010. Administrative Record ("AR") 135-38, 164. His application was initially denied on August 20, 2013, and again on reconsideration on October 31, 2013. AR 66-70, 74-80. He then filed a request for hearing before an Administrative Law Judge (ALJ). AR 81-82.

After the hearing, ALJ Wynne O'Brien-Persons issued a decision finding Hoffschneider not disabled. AR 10-20. The Appeals Council denied Hoffschneider's request for review on

---

[1] On Jan. 20, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant. In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

United States District Court
Northern District of California

November 17, 2016.  AR 1-6.  The ALJ's decision therefore became the Commissioner's final

decision.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).

Hoffschneider then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.     THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable

physical or mental impairment that prevents her from engaging in substantial gainful activity[2] and

that is expected to result in death or to last for a continuous period of at least twelve months.

*Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The

impairment must render the claimant incapable of performing the work she previously performed

and incapable of performing any other substantial gainful employment that exists in the national

economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20

C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

1.      At the first step, the ALJ considers the claimant's work activity, if any.  If the

claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.      At the second step, the ALJ considers the medical severity of the claimant's

impairment(s).  If the claimant does not have a severe medically determinable physical or mental

impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of

impairments that is severe and meets the duration requirement, the ALJ will find that the claimant

is not disabled.

3.      At the third step, the ALJ also considers the medical severity of the claimant's

impairment(s).  If the claimant has an impairment(s) that meets or equals one of the listings in 20

C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will

find that the claimant is disabled.

4.      At the fourth step, the ALJ considers an assessment of the claimant's residual

functional capacity ("RFC") and the claimant's past relevant work.  If the claimant can still do his

---

[2] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

or her past relevant work, the ALJ will find that the claimant is not disabled.

5.  At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.  ADMINISTRATIVE RECORD

### A.  Relevant Medical Evidence

Hoffschneider saw numerous providers for back problems and back-related pain from 2009 to 2015.  The court provides the following summary of the relevant medical evidence.

#### 1.  Kaiser Providers: 2009 - 2012

Hoffschneider was treated for back problems by Kaiser providers Todd Weston Weitzenberg, M.D., Cheryl Elizabeth Green, M.D., Andrew Vitali Slucky, M.D., Kern Hayden Guppy, M.D., and G.R. Lindee, M.D. from 2009 to 2012.

##### a.  Todd Weston Weitzenberg, M.D., 2009-2012

Hoffschneider started seeing Weitzenberg in December 2009, complaining of severe back pain that was not adequately addressed by his current pain medications.  AR 370 (12/2/09 visit: "Patient is requesting stronger pain medication.  He also needs a refill of his spasm medication . . . . His back is really tight and sore after the weekend."); 372 (12/7/09 visit: "Patient re-injured his back and is in excruciating pain.  He states "it's the worst it's ever been. . . . Current pain medications are not helping.").   In response, Weitzenberg prescribed Hydrocodone-Acetaminophen, Methocarbamol, and Prednisone.  *Id*.

In 2010, Hoffschneider underwent a discectomy performed by Slucky.  Following the 2010 surgery, Hoffschneider continued to complain of back pain.  For example, on July 22, 2010, Hoffschneider complained that his back still hurt and requested more "[N]orco" since "that [was] the only thing that help[ed]."  AR 404.  In response, Weitzenberg refilled his Hydrocodone-Acetaminophen prescription.  AR 404.  Additionally, on September 14, 2010, Hoffschneider

complained of worsening back pain and pain starting from the right hip and going down his leg. AR 406-408. Weitzenberg thereafter started him on an oral prednisone pulse/taper. AR 408. On November 23, 2010, Hoffschneider reported "constant, worse with standing/walking/activity, stabbing pains" at the base of his spine, and that about 50% of the time the pain radiated into his leg. AR 433. Weitzenberg prescribed Gabapentin and recommended a trial of a transforaminal epidural steroid injection for the S1 vertebrae, and an orthopedic spine surgery consultation. AR 434.

In 2011, Hoffschneider continued to report back pain which led Weitzenberg to administer an injection on November 7, 2011. On August 16, 2011, Hoffschneider reported continued back pain, but stated that he was working as a window installer full time, and exercising at the gym 5 days per week. AR 455. Weitzenberg counseled Hoffschneider and offered to provide him with a second opinion on surgery. AR 455. On November 4, 2011, Weitzenberg noted that the second opinion (by Slucky) did not recommend additional surgery. AR 478. At this visit, Hoffschneider complained of continued pain localized to his lower back pain, which he described as random, stabbing and severe, with some radiating pain into the posterior right thigh. AR 478. He reported that he was going to the gym daily, working on a home exercise program, and was not taking any pain medications, and also denied significant numbness, tingling, weakness, bowel or bladder symptoms, or perineal paresthesias. AR 478. Upon a physical examination, Weitzenberg observed a full active range of motion with pain upon return to neutral; a normal gait, toe, heel walk with no ataxia; and no deformity, atrophy, or muscle fasciculations in the extremities. AR 479. Three days later, on November 7, 2011, Weitzenberg administered a fluoroscopic spinal injection of the right L4-5 vertebrae. AR 491-94. The injection provided Hoffschneider with little to no relief. AR 512. Accordingly, Weitzenberg started Hoffschneider on Lyrica. AR 512-513.

In 2012, Hoffschneider underwent additional injections to address his back pain. On March 26, 2012, Weitzenberg administered fluoroscopic bilateral L5-S1 facet joint injections. AR 591-92. Following the March 2012 injection, Hoffschneider reported that he did not experience much relief, as he continued to require pain medications. AR 609-616; AR 629-30 (4/26/12 visit)

4

United States District Court
Northern District of California

(assessing Hoffschneider as having "no significant improvement" after the bilateral facet block injections and recommending a bilateral medial branch block injection at L5-S1). On April 30, 2012, Weitzenberg performed a bilateral medial branch block injection at L5-S1. AR 657-59. Following the April 2012 injection, Hoffschneider reported that he experienced one day of pain relief, but overall had no significant improvement. AR 704-05. In May 22, 2012 consult notes, Weitzenber stated that he did not recommend a rhizotomy based on Hoffschneider's poor response to the steroid injections and medial branch blocks, and that Hoffschneider declined to participate in a chronic pain program. AR 705. On December 11, 2012, Hoffschneider reported that he had increased right-sided sciatica, which was getting worse and that he was taking 3 Hydrocodone-Acetaminophen per day. AR 757. Upon a physical examination, Weitzenberg observed that Hoffschneider had a full active range of motion without significant pain; a normal gait, toe, heel walk, no ataxia; and a positive straight-leg raise on the right. AR 758. Weitzenberg recommended that he undergo a lumbar epidural steroid injection with Dr. David Vidaurri, which was later scheduled for January 2, 2013. AR 758. Hoffschneider ultimately did not undergo this procedure due to a loss of Kaiser insurance coverage. AR 793.

> **b. Primary Care Physician Cheryl Elizabeth Green, M.D.: 2009 - 2012.**

Green was Hoffschneider's primary care physician from 2009 through 2012. The back-related treatment rendered by Green appears to be limited to a December 2009 MRI lumbar spine which she ordered, refilling Hoffschneider's pain medication as needed in 2011 and 2012, and one in-person visit on August 29, 2012.

On December 11, 2009, Hoffschneider had an MRI on his lumbar spine at Green's request. AR 374. Dr. Joe Russell Smith interpreted the 2009 MRI and opined that there was "no significant change" from a prior October 16, 2008 MRI, and that he continued to see "degenerative changes of [the] lower lumbar spine" and "[s]table right posterolateral disk protrusion at L5-S1, displacing the traversing nerve root." AR 375. In 2011 and 2012, the record shows that Green continued to refill Hoffschneider's pain medication prescriptions as needed and requested. *See, e.g.*, AR 523-24 (12/20/11) (filling prescriptions for Norco, and Celebrex after failed injection); AR 716 (7/2/12) (refilling Norco prescription). On August 29, 2012, Green saw

Hoffschneider for complaints of low back pain. AR 744. According to Green, Hoffschneider had several injections from which he did not receive substantial relief, and "bottom line" was "asking for disability." AR 744. Upon a physical examination, Green observed that Hoffschneider's back had limited range of motion with flexion and bilaterally had a negative straight-leg raise. AR 744. In the assessment portion, Green noted that she had a long discussion with Hoffschneider about pain management and that Hoffschneider was not interested in participating in a chronic pain program and expressed most interest in disability, although he was not currently employed. AR 745. Green opined that she did not feel his condition "warrant[ed] disability" and encouraged him to do daily exercises. AR 745.

### c. Andrew Vitali Slucky, M.D.: 2009 through 2011 (2010 Discectomy)

On December 19, 2009, Hoffschneider saw Slucky for a spine surgery consult on a discectomy decompression at L5-S1. AR 238. At this visit, Slucky noted that Hoffschneider complained of progressive increased right leg pain with marked increased recent intensity that radiated to the posterior thigh/calf/lateral-plantar foot margins, and reported that he could only walk for less than 2 blocks and could sit for no more than 30 minutes. AR 239.

On February 18, 2010, Slucky performed a discectomy at the L5-S1 on the right side of Hoffschneider's spine. AR 295. Slucky then saw Hoffschneider on March 29, 2010 for a post-operative visit. AR 348. At this visit, Hoffschneider stated that he felt improvement in the pre-operative symptoms of sciatica, but had continued lower back pain. AR 349. Slucky observed that Hoffschneider's sciatica had resolved, but that he still had baseline lower back pain. AR 349. For his lower back pain, Slucky recommended that Hoffschneider continue self-directed physical therapy/aerobics. AR 349.

Hoffschneider next saw Slucky on September 2, 2011 for an evaluation of chronic lower back pain. AR 353. Upon a physical examination, Slucky observed that Hoffschneider's gait was within normal limits and his alignment was upright and centered. AR 353. Slucky noted that x-rays showed degenerative disc disease at L4-S1 but no instability, and a 2010 MRI showed increased degenerative disc disease, and mild residual herniated nucleus pulposus at L5-S1. AR 353. Based on physical examination, Hoffschneider's reported symptoms, and a review of the

relevant imaging, Slucky opined that Hoffschneider presented with lower back pain secondary to multi-level degenerative disc disease, but found no evidence of segmental instability or neurologic compromise/complaint. AR 353. Slucky opined that there were "no spinal surgery indications" and that he expected Hoffschneider to resume activities as tolerated. AR 353.

### d. Radiologist GR Lindee, M.D.: November 2010 and February 2012 MRIs

On November 19, 2010, Hoffschneider had an MRI of the lumbar spine. AR 427. Lindee interpreted the MRI and observed that there was no significant change from the December 2009 MRI. AR 428. At L4-5, Lindee observed that there was "stable mild broad-based disk bulge without stenosis or foraminal encroachment." AR 427. At L5-S1, he noted that there was "right disk protrusion" and that the herniated disk appeared to be "slightly smaller" and there "was an 'adjacent enhancing scar' that resulted in a "mass effect on the right S1 nerve root." However, he also noted that there was "no significant foraminal encroachment" at L5-S1. AR 428.

A little over a year and half later, on February 9, 2012, Hoffschneider had a follow-up MRI of the lumbar spine. AR 550. Lindee interpreted the 2012 MRI and noted the results were nearly the same as the prior 2010 MRI. Lindee observed that there was "mild disc desiccation at L4-5," but that the spine was "otherwise unremarkable." AR 555. At L5-S1, Lindee found that there was "stable broad-based disc protrusion, lateralizing to the right" and a "stable adjacent enhancing scar encasing the right S1 nerve root within the lateral recess," but "no significant foraminal encroachment." AR 555.

### e. Neurosurgeon Kern Hayden Guppy, M.D.: September 2011 Surgical Consult

On September 9, 2011, Hoffschneider saw Guppy for a neurosurgical spine consult. AR 356. At this visit, Hoffschneider presented with lower back pain both standing and sitting, which felt better with ice, Norco, and Percocet. AR 356. Guppy noted that Hoffschneider had surgery in February 2010 for right buttock to heel foot pain, and that the pain returned a year later. AR 356. Upon a physical examination, Guppy observed that Hoffschneider's muscle strength was normal in his left and right arms and legs. AR 357. Based on his physical examination, Hoffschneider's

subjective history, and MRI results, Guppy opined that the "role of surgery" for lower back pain was "controversial especially [without] evidence of instability." AR 357. He also stressed that Hoffschneider needed to be treated conservatively with epidurals and physical therapy, and that fusion surgery at L5-S1 carried a 50/50 success rate. AR 357.

### 2. Treating Physician Mary A. Berg, M.D.: May 2013 through September 2013

Hoffschneider saw treating physician Berg from May 2013 through September 2013 for back pain and chronic pain syndrome. AR 812-27.

On May 23, 2013, Berg described Hoffschneider's history of present illness as "pain in right buttocks and down the leg to the back near achilles tendon area bilaterally" and that Hoffschneider was "unable to work for years having been in pain since his early 20's." AR 826. Upon a physical examination, she noted that there was pain from Hoffschneider's lower back (lumbar) into his legs posteriorally, the pain was worse in the right leg than the left, and the pain radiated into the heels. AR 826. She also observed that Hoffschneider did not complain of any muscle weakness and his gait was normal. AR 826. For his back pain, Berg started Hoffschneider on Methadone. AR 826.

Hoffschneider returned for a follow-up visit on June 13, 2013. AR 823. At this visit, Berg noted that Hoffschneider had recently started on MS Contin and "th[ought] that MS [Contin] may be working OK"; she also observed that the referral to Botehlo for pain management "[was] going well." AR 823. She indicated that Hoffschneider had been on a trial chronic back stimulator and felt "50-60% better with his leg pain" but not with his lumbar pain. AR 823. Upon a physical examination, she observed that his patellar reflexes were "non-existant" but the ankle reflexes were "1-2+" and the muscle strength of the lower extremity was 4/4. AR 823. She continued Hoffschneider on MS Contin. AR 824.

On July 25, 2013, Berg saw Hoffschneider for a follow-up visit on the MS Contin pain-management referrals. AR 820. At this visit, she diagnosed Hoffschneider with chronic pain syndrome in addition to back pain. AR 820. According to her progress notes, Hoffschneider took Oxycontin 15mg every 8 hours, felt better, was "hardly using any Norco" and was seeing Botehlo

who was considering implanting a Medtronic nerve stimulator to reduce his pain. AR 820. Upon a physical examination, Berg noted that there was "no bony tenderness" and "no muscle spasm" in his back, "full range of motion," and a negative straight leg raise test. AR 820. She also observed that his station and gait were normal, the reflex testing was symmetrical, and the special sensory examination was "grossly normal." AR 820. To treat his pain, she continued him on MS Contin, which she observed "seem[ed] to be working well." AR 821.

On September 23, 2013, Berg completed a Residual Functional Capacity ("RFC") Questionnaire, in which she evaluated Hoffschneider's functional limitations. AR 815-14. She diagnosed Hoffschneider with a L5-S1 herniated disc which was treated with 2 surgeries and chronic pain, rated Hoffschneider's prognosis as "poor," and noted various clinical findings including MRIs showing a herniated disc, and testing showing a lack of reflexes for patellar ankle bilaterally, and an abnormal gait. AR 812. Regarding Hoffschneider's functional limitations, Berg opined that Hoffschneider (1) could sit and stand for 5 minutes at one time; (2) must sit in a recliner or lie down each day; (3) could sit and stand for less than 2 hours in an 8-hour working day; (4) needed a cane or other assistive device while occasionally standing or walking; (5) needed to take unscheduled breaks lasting 10-15 minutes every 40 minutes; (6) could never lift more than 10 lbs.; (7) was unable to perform repetitive reaching, handling or fingering; (8) could not grasp, turn twist objects; perform fine manipulation; or reach with both arms during an 8-hour working day; (9) could not stoop, crouch, kneel or climb stairs for any percentage of an 8-hour working day; and (10) Hoffschneider's impairments were always likely to produce "bad days." AR 812-13. Berg further opined that Hoffschneider had trouble sleeping from chronic opioid use; was depressed from being ineffective, i.e., being unable to help support his wife and children; suffered from memory loss, confusion, and forgetfulness; and only drove on a limited basis. AR 813.

On September 25, 2013, Berg saw Hoffschneider for a 2-month follow-up on pain management. AR 817. At this visit, Hoffschneider indicated that the Medtronic neural stimulator was "helping," but that the location of the battery pack made it difficult for him to bend over and pick something up. AR 817. Hoffschneider also reported that he was having trouble sleeping, his pain "was still not under control," and that despite the fact that he was using Morphine and

9

Oxycodone, the "level pain coverage has still not been achieved." AR 817. Upon a physical examination, Berg observed that the implanted Medtronic neural stimulator/battery pack was larger than a cellphone and implanted in the right, posterior flank, and that Hoffschneider "searche[d] for words when he talks - as if thinking clearly [did not] come automatically though he also carrie[d] out complex tasks related to his home responsibilities and physical therapy." AR 817. To treat his pain, Berg continued Hoffschneider on Oxycodone and Morphine Sulfate tablets, noting that the "pain [wa]s not adequately controlled yet." AR 818. For his back pain, Berg recommended that Hoffschneider continue to use the Medtronic neural stimulator. AR 818.

Hoffschneider returned to Berg on October 2, 2013 to review lab results. AR 814. At this visit, Hoffschneider presented with same symptoms as on the September 2013 visit. AR 814, 817. To treat his pain, Berg continued him on Morphine Sulfate Tablets and Oxycontin. According to Berg's progress notes, Hoffschneider was still having pain in the area of the battery pack, but "in general" felt the pain was "controlled." AR 815. Hoffschneider also indicated that he had not been exercising at the gym because he was taking care of his youngest child while his wife underwent a procedure. AR 815. Berg thereafter recommended a 2-month follow-up for anti-depressants, insomnia and pain management. AR 815.

### 3. Treating Physician Ronald J. Botehlo, M.D.: September and December 2013

Hoffschneider saw treating physician Botehlo in September and December 2013 for pain management. AR 830-35.

On September 11, 2013, Hoffschneider returned to Botehlo,[3] and reported that he was using the neural stimulator more frequently, and that he had "no complaints." AR 833. At this visit, Hoffschneider described aching, sharp, cutting, throbbing, pressure, shooting, and burning pain that was constantly present (100% of the time) and a pain level of 7/10 on that visit and 8/10 over the last week. AR 833. Hoffschneider reported that he could only walk, sit, and stand for 20 minutes before having to stop these activities and that he frequently had to lie down due to pain

[3] There are no medical records showing the date of the prior visit.

10

during the day. AR 834. In the assessment portion of his progress notes, Botehlo diagnosed Hoffschneider with postlaminectomy syndrome of the lumbar region, and noted that Hoffschneider was "doing well with improved programs." AR 835.

Hoffschneider returned to Botehlo on December 12, 2013, complaining of increased pain in his right leg and the usual locations. AR 830. According to Botehlo's progress notes, the neural stimulator "continue[d] to help" and Hoffschneider was using it constantly. AR 830. At this visit, Hoffschneider described aching, sharp, and shooting pain that was constantly present, and pain that was 9/10 at that visit and over the last week. AR 830. Upon a physical examination, Botehlo noted that there was "symmetric bulk, tone, and strength" in his lower extremity, sensation testing showed "intact sensation to light touch," and the reflexes were patellar 2+ and achilles 2+ symmetric. AR 832. In the assessment portion of his progress notes, Botehlo opined that Hoffschneider was "stable." AR 832.

### 4. Neurosurgeon Alan T. Hunstock, M.D.: July 1, 2013

On July 1, 2013, Hoffschneider was referred to Hunstock by Berg for a neurosurgical consultation. AR 804. In his progress notes, Hunstock indicated that Hoffschneider had a long history of low back pain and sciata and experienced limited improvement after the 2010 discectomy. AR 804. At this visit, Hoffschneider rated his pain as 8 out of 10, but reported he had good relief of right leg pain from the spinal stimulator trial administered by Botehlo. AR 804. Upon a physical examination, Hunstock observed that Hoffschneider had a normal gait, but that his lumbar mechanics were "significantly limited to about 30% of normal in all directions with negative straight leg raising." AR 806. Based on his physical examination, Hoffschneider's history, and the relevant imaging, Hunstock diagnosed him with chronic right S1 radiculopathy secondary to protruding L5-S1 disk and status post L5-S1 diskectomy. AR 806. He opined that "further surgery at L5-S1 would not guarantee any improvement over and above where he [was] at this point" and this "would be the case whether it was a diskectomy alone or a diskectomy plus fusion." AR 806.

### 5. Treating Physician A. Shabi Khari, M.D.: June 2014

On June 26, 2014, Hoffschneider saw treating physician Khari for a second opinion on his

back.  AR 836-37.  According to Khari's progress notes, Hoffschneider presented with a history of "significant low back pain, with great difficulty in mobilizing this area," and that while he obtained some relief from the two prior surgeries, "persistent symptoms continue[d] at this time." AR 836.  Upon physical examination of his lumbar spine and left side, Khari observed that there was decreased flexion and extension of the lumbar spine, a positive straight leg raise test on the left, and a very mild loss of lumbar lordosis.  AR 837.  Khari also noted that Hoffschneider's reflexes seemed to be intact and normal on one side and that his gait pattern was within normal limits.  AR 837.  Khari diagnosed Hoffschneider with chronic lumbar degeneration with radiculopathy and persistent pain syndrome, and fitted him with a lumbar support.  He also opined that Hoffschneider had a "very difficult situation on his hands," was "not a great candidate at this time for a spinal fusion given his significant back pain as well as radiculopathy," and that "it "[was] going to be very difficult for him to be gainfully employed."  AR 837.

### 6.  Alexander Valley Healthcare (Cary Wheeler DO): February 2014 - April 2015

Hoffschneider saw Wheeler in 2014 and 2015 for refills on his pain medications.  *See* AR 887-88 (2/27/14 visit for refill on Oxycodone, Morphine Sulfate, and Norco); 874-75 (7/3/14 visit for refill regarding the same); 867-68 (9/15/14 visit for refill regarding the same); 852-53 (1/7/15 visit for refill regarding the same); 842-43 (3/11/15 visit for refill regarding the same); 839-40 (4/8/15 visit for refill regarding the same).  At the September 15, 2014 visit, Hoffschneider reported that he had lower back pain, but that his medication pain was working well and had no request to change it.  AR 868.  Similarly, on January 1, 2015, he indicated that he was stable on the current dose of pain medication and had improved functionality and "good pain control" on his current pain regimen.  AR 852.  Likewise, on March 11, 2015 and April 8, 2015, he continued to report that his pain was controlled and his medication plan was working well.  *See* 3/11/15 visit (AR 842) ("Did well this month with medication taper, willing to continue.  Discussed converting morphine dose to oxycodone and stopping MS.  Denies withdrawal symptoms.  Pain remains controlled."); 4/8/15 visit (AR 839) ("Description of pain: Sharp/stabbing, Burning, Constant.  Medication Plan: Working well, no request to change.").

### B. Hoffschneider's Testimony

Hoffschneider provided the following testimony at the May 5, 2015 hearing. Hoffschneider was 44 years old on the date of the hearing. AR 29. He lived with his wife and in-laws. AR 33. His highest level of education was high school. AR 29. He last worked as a maintenance worker in 2010. AR 30. Hoffschneider testified that he stopped working due to back problems which had not gone away. AR 30. He experienced daily back pain that started from the top of his right hip down to his feet, as well as back spasms. AR 30, 32. To alleviate the pain and spasms, he took pain medications including Norco (brand name for hydrocodone-acetaminophen), Oxycodone, Morphine, and sleeping pills. AR 30-31. The pain medications affected his ability to focus and as a result, he did not drive. AR 31, 33. He had a nerve stimulator in his back that assisted in masking the pain. AR 34. Because of his back pain, he could not sit or stand for more than 20 minutes at a time before he had to change positions, and could not walk for more than 10 minutes. AR 31. He also avoided bending at the waist. AR 31. Hoffschneider also testified that he was unable to perform chores around the house such as cooking or cleaning. AR 31. As a maintenance worker in a winery, Hoffschneider used to lift over 100 pounds; at the time of the hearing, Hoffschneider could not lift 10 pounds. AR 31, 35. On a typical day, Hoffschneider stated that he walked around the house, watched TV, and primarily laid down on the bed or couch. AR 31, 33. According to Hoffschneider, laying down provided the most relief for his back pain. AR 32, 33. He also took naps during the day due to the medications. AR 33. He used to go to the gym to try and walk on the treadmill, but had not been back to the gym in years and did not recall the last time he was able to go the gym. AR 35. Hoffschneider further testified that his doctors told him that his back condition was degenerative and that the only option he had left was back fusion surgery. AR 32, 34. He, however, wanted to wait as long as he could to schedule the surgery because there was only a 50/50 chance that it would be successful. AR 32.

### C. Vocational Expert Lynda Berkley.

At the hearing, the VE categorized Hoffschneider's past work history as follows: winery worker, DOT code 521.685-370, with a medium exertional level and a SVP[4] of 3; cabinet

---

[4] "'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the

maker/installer, DOT code 660.280-010, with a medium exertional level and a SVP of 6; and maintenance repairer, building, DOT code 899.381-010, with a medium exertional level, and a SVP of 7. AR 36-37.

The ALJ posed four cumulative hypotheticals to determine what jobs an individual with Hoffschneider's restrictions could perform. To start, the ALJ posed the following hypothetical: an individual of Hoffschneider's age, education, and prior work experience described by the VE, who is able to perform light work with a limitation of walking and standing 2 hours in an 8-hour day with no ladders, ropes, and scaffolds, with all other postural positions at occasional level, with an avoidance of moderate exposure to vibrations, and an avoidance of concentrated exposure to hazards; and who would be off-task approximately 5% of the workday due to pain medication. AR 37. The VE testified that an individual with such restrictions would be unable to perform any of Hoffschneider's past work. AR 37. However, she testified that an individual with these restrictions would be able to perform the following two jobs at the light exertional level: 1) parking lot cashier, DOT code 211.162-010 and a SVP of 2; and 2) storage facility rental clerk, DOT code 295.367-026 and a SVP of 2, and one job at the sedentary level: document preparer, DOT code 249.587-018 and a SVP of 2. AR 37-38.

The ALJ then posed a second hypothetical which included the first, but added the following restriction: the individual needed to alternate positions approximately every 20 minutes. AR 38. The VE testified that an individual with these restrictions would be able to perform work as a parking lot cashier. AR 38.

The ALJ then posed a third hypothetical which included the first and the second, but added the following restriction: the individual would have to walk for 10 minutes in one of the

amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.' " *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230, n.4 (9th Cir. 2009) (quoting Dictionary of Occupational Titles, Appendix C, p.1009 (4th ed. 1991)). " 'The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT.'" *Bray*, 554 F.3d at 1230, n.4 (quoting Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions, SSR 00-4P (S.S.A. Dec. 4, 2000)).

alternating position changes.  AR 39.  The VE testified that an individual with these restrictions would be unable to perform work as a parking lot cashier or storage facility rental clerk.  AR 39-40.

The ALJ then posed a fourth hypothetical, which included the first, the second, and third, but added the following restriction: the individual would have to lay down one hour outside of break times.  AR 40.  The VE testified that an individual with these restrictions would be precluded from full-time employment.  AR 40.

### D.    The ALJ's Decision

The ALJ performed the five-step disability analysis and found Hoffschneider not disabled under Section 1614(a)(3)(A) of the Social Security Act.  AR 10-20.  At the second step, the ALJ determined that Hoffschneider had the following severe impairment:  post-laminectomy syndrome of lumbar.  AR 15.  At Step 3, the ALJ found that his impairment did not meet or equal Listing 1.04, *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1.  AR 15.  The ALJ then determined that Hoffschneider had the following residual functional capacity (RFC): he had the capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) with limitations including standing and walking 2 hours in an 8-hour day; no climbing ladders, ropes, or scaffolds; avoiding moderate exposure to vibration and concentrated exposures to hazards; being off task 5% of the workday due to pain; and alternating positions every 20 minutes.  AR 15.  The ALJ found that Hoffschneider was unable to perform any past relevant work, but concluded that there were jobs that he could perform with such an RFC.  AR 19-20.  In so concluding, the ALJ relied on the opinion of the VE, who testified that an individual with such an RFC could perform other jobs existing in significant numbers in the national economy, including parking lot cashier and storage facility rental clerk.  AR 20.

### IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the district court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180

F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a mere scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.     ISSUES PRESENTED

Hoffschneider contends that the ALJ erred by 1) failing to properly evaluate all the relevant medical evidence; 2) failing to discuss whether he met or equaled Listing 1.04 at Step 3; 3) rejecting his credibility; and 4) committing error in the determination of his RFC.  He requests that the court remand for payment of benefits because all three requirements of the "credit-as-true" rule are met as set forth in *Garrison v. Colvin*, 759 F.3d 995, 1020-21 (9th Cir. 2014).

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.    DISCUSSION

### A.  The ALJ's Evaluation of Medical Evidence

Hoffschneider argues that the ALJ erred in (1) giving only partial weight to Berg's September 2013 RFC; (2) failing to address the opinion of treating physician Botehlo; (3) failing to provide a reason for rejecting the opinion of treating physician Khari; and (4) failing to address the opinions of specialists Slucky, Guppy, Smith, Lindee, and Hunstock.

//

### 1. Legal Standards

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v.*

*Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant).  An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record."  *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998).  An opinion that is more consistent with the record as a whole generally carries more persuasiveness.  *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

#### a. Berg

Berg opined that Hoffschneider (1) could sit and stand for 5 minutes at one time; (2) must sit in a recliner or lie down each day: (3) could sit and stand for less than 2 hours in an 8-hour working day; (4) needed a cane or other assistive device while occasionally standing or walking; (5) needed to take unscheduled breaks lasting 10-15 minutes every 40 minutes; (6) could never lift more than 10 lbs.; (7) was unable to perform repetitive reaching, handling or fingering; (8) could not grasp, turn twist objects; perform fine manipulation; or reaching with both arms during an 8-hour working day; and (9) could not stoop, crouch, kneel or climb stairs for any percentage of an 8-hour working day.  AR 812-13.

The ALJ assigned partial weight to Berg's RFC because she found that some of the limitations described were subjective, coming solely from Hoffschneider, and there was no objective evidence or testing to support Berg's RFC.  AR 18.

Hoffschneider contends that the ALJ erred in failing to provide clear and convincing reasons for assigning only partial weight to Berg's RFC because Social Security regulation 16-3p requires that the ALJ consider subjective evidence, as well as objective evidence.  According to Hoffschneider, the ALJ cannot discount Berg's RFC because it includes subjective evidence from Hoffschneider about his pain.  He also argues that there is objective evidence to support Berg's RFC, and that the ALJ erred in concluding otherwise.

 Since Berg's RFC is not contradicted by any other medical opinion, the ALJ was required

to provide "clear and convincing" reasons supported by substantial evidence to discount her RFC. *See Lester*, 81 F.3d at 830.

Having reviewed the entire record, the court finds that the ALJ provided clear and convincing reasons for assigning partial weight to Berg's RFC that are supported by substantial evidence.

*First*, despite what Hoffschneider contends, the ALJ did not summarily discount the entirety of Berg's RFC simply because it was based on subjective evidence from Hoffschneider about his pain. Rather, the ALJ explained that she partially discounted the RFC because "some of the limitations" described were based on subjective evidence from Hoffschneider about his pain and limitations. The ALJ previously determined that Hoffschneider's subjective complaints about his pain were not fully credible, so the ALJ accordingly assigned less weight to portions of the RFC based on Hoffschneider's subjective complaints of pain. *See, e.g., Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (discounting treating physician's opinion because it "was in the form of a checklist, did not have supportive objective evidence, was contradicted by other statements and assessments of [the plaintiff's] medical condition, and was based on [the plaintiff's] subjective descriptions of pain"). .

*Second*, there is substantial evidence to support the ALJ's finding that there was no objective testing or evidence to support Berg's RFC.

Specifically, although the MRIs from 2009-2012 showed degenerative changes of the lower lumbar spine and a herniated disk, there were no significant changes observed over that three year period and no evidence of "significant foraminal encroachment." 2009 MRI (AR 374-75) (finding "no significant change" from a prior October 16, 2008 MRI; noting "degenerative changes of [the] lower lumbar spine" and "[s]table right posterolateral disk protrusion at L5-S1, displacing the traversing nerve root"); 2010 MRI (AR 427) (finding no significant change from the December 2009 study, and "no significant foraminal encroachment" at L5-S1; observing "right disk protrusion"); 2012 MRI (AR 550, 555) (finding "mild disc desiccation at L4-5," "stable broad-based disc protrusion, lateralizing to the right," and "stable adjacent enhancing scar encasing the right S1 nerve root within the lateral recess," but "no significant foraminal

encroachment").

Accordingly, in 2011, neither Slucky nor Guppy recommended Hoffschneider for surgery. On September 2, 2011, Slucky opined that although Hoffschneider had lower back pain secondary to multi-level degenerative disc disease, there were no "spinal surgery indications" because there was no evidence of segmental instability or neurologic compromise/complaint and that he expected Hoffschneider to resume activities as tolerated. AR 353. Similarly, on September 9, 2011, Guppy opined that the "role of surgery" for lower back pain was "controversial especially [without] evidence of instability" and that Hoffschneider needed to be treated conservatively with epidurals and physical therapy, among other things. AR 357.

In 2013, Berg continued to observe generally normal results for Hoffschneider's gait, strength, and reflex testing in the 2-3 months prior to the September RFC. For example, at the June 13, 2013 visit, Berg observed that while Hoffschneider's "patellar reflexes were 'non-existent,'" his ankle reflexes were "1-2+" and the muscle strength of his lower extremities was 4/4, and that he felt "50-60% better with his leg pain." AR 824. At the July 25, 2013 visit, Berg indicated that there was "no bony tenderness" and "no muscle spasms" in Hoffschneider's back, and that he had a full range of motion and a negative straight leg raise test. AR 820. Berg also found that his station and gait were normal, the reflex testing was symmetrical, and the special sensory examination was "grossly normal." AR 820. She also noted that his pain medication regimen (MS Contin) "seem[ed] to be working well." AR 821. Similarly, on July 1, 2013, Hunstock observed that while Hoffschneider's lumbar mechanics were "significantly limited to about 30% of normal in all directions with negative straight leg raising," he had a normal gait and reported good relief from his right leg pain as a result of a spinal stimulator trial administered by Botehlo. AR 804.

While it is possible that the evidence could support a different conclusion given the varying results on Hoffschneider's physical examinations and the prolonged nature of his symptoms and pain, the court cannot substitute its judgment for that of the ALJ. *See Jamerson*, 112 F.3d at 1066 (explaining that if the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the

decision).

In conclusion, the ALJ did not err in assigning partial weight to Berg's RFC because the ALJ provided clear and convincing reasons for doing so that were supported by substantial evidence in the record.

### b. Botehlo

Botehlo saw Hoffschneider for two pain management visits. *See* AR 830, 833. At the September 11, 2013 visit, Botehlo diagnosed Hoffschneider with postlaminectomy syndrome of the lumbar region, but observed that he was "doing well with improved programs." AR 835. At the December 12, 2013 visit, Hoffschneider reported aching, sharp, and shooting pain that was present constantly and pain that was 9/10 at that visit and over the last week. AR 830. Upon a physical examination, however, Botehlo observed upon that Hoffschneider was "symmetric bulk, tone, and strength" in his lower extremity, had "intact sensation to light touch," and the reflexes were patellar 2+ and achilles 2+ symmetric. AR 833. Botehlo opined that Hoffschneider was "stable." AR 832.

Hoffschneider argues that the ALJ erred in failing to address Botehlo's December 12, 2013 findings that his pain was present 100% of the time, was "severe, sharp, cutting, throbbing, pressure, shooting, and burning" and his pain scale was 9/10. According to Hoffschneider, the ALJ was required to discuss Botehlo's findings since he was a treating physician.

While Hoffschneider is correct that the ALJ did not specifically mention Botehlo by name in the opinion, the ALJ summarized Botehlo's findings from the September 11, 2013 and December 12, 2013 visits as part of the review of the medical evidence.[5] AR 17. Following the summary of Hoffschneider's treatment with Berg, the ALJ then discusses the September 11, 2013 and December 12, 2013 visits with Botehlo in which Botehlo observed that Hoffschneider was doing well with improved programs and that he was stable. *See* AR 17 (citing to Exhibit 7F/6, which is AR 835); *see* AR 835 (9/11/13 visit notes: "Erik is doing well with improved programs. He will follow up in a month[] or as needed."); *see also* AR 17 (citing Exhibit 7F/1-3, which is

[5] Hoffschneider contends that he saw Botehlo for six months from June 2013 to December 2013. The record only contains medical records from the September and December 2013 visits.

AR 830-32); *see also* AR 832 (12/12/13 visit notes: "Erik is stable.").

To the extent that the ALJ was required to specifically reject Botehlo's findings, the error was harmless. Contrary to Hoffschneider's contention, Botehlo did not offer any opinions regarding his pain. The December 12, 2013 progress notes show that Botehlo was simply documenting pain descriptions taken from Hoffschneider. AR 830. Furthermore, Botehlo offered no opinions on Hoffschneider's functional limitations. Botehlo simply noted Hoffschneider's own report of his functional limitations. AR 834. The only opinions Botehlo offered were that Hoffschneider was doing well on his improved pain programs at the September 2013 visit and was stable at the December 2013 visit. AR 832, 835. Since these opinions did not relate to Hoffschneider's functional limitations, the ALJ was not required to address them.

In conclusion, the ALJ did not err in failing to specifically address Botehlo's findings.

### c.    Khari

Khari saw Hoffschneider on one occasion on June 26, 2014. AR 836-37. At this visit, Khari observed that there was decreased flexion and extension of Hoffschneider's lumbar spine, a positive straight leg raise test on the left, and a very mild loss of lumbar lordosis, but also noted that his reflexes seemed to be intact and normal on one side and his gait pattern was within normal limits. AR 837. He opined that Hoffschneider had a "very difficult situation on his hands," was "not a great candidate at this time for a spinal fusion given his significant back pain as well as radiculopathy," and that "it [was] going to be very difficult for him to be gainfully employed." AR 837.

Hoffschneider contends that the ALJ erred in failing to place any specific weight on Khari's opinion. According to Hoffschneider, because Khari is a specialist (orthopedic surgeon), his opinion is entitled to more weight than non-specialists and his uncontroverted findings "stand as a finding" that he is disabled. His argument is unpersuasive for several reasons.

*First*, while Hoffschneider is correct that the ALJ should have assigned a weight to Khari's opinion since he was a treating physician, the error is harmless because his opinion was cumulative of other medical evidence in the record.

For example, Guppy, Slucky, and Hunstock also opined that Hoffschneider was not a good

candidate for spinal fusion surgery for his lower back pain. *See, e.g.,* AR 353 (9/2/11 visit with Slucky) (noting that there were no "spinal surgery indications" because there was no evidence of segmental instability or neurologic compromise/complaint); AR 357 (9/9/11 visit with Guppy) (observing that the "role of surgery" for lower back pain was "controversial especially [without] evidence of instability"); AR 806 (7/1/13 visit with Hunstock) (opining that "further surgery at L5-S1 would not guarantee any improvement over and above where" he was at).

Additionally, several other providers also observed that Hoffschneider's reflexes generally appeared to be normal and his gait pattern was normal despite certain other abnormal results upon a physical examination. *See, e.g.,* 9/2/11 visit with Slucky (AR 353) (observing that Hoffschneider's gait was within normal limits and his alignment was upright and centered); 11/4/11 visit with Weitzenberg (AR 479) (observing that while there was severe tenderness to palpation around the surgical scar and throughout the thoracodorsal fascia, there was full active range of motion with pain upon return to neutral and a normal gait, toe, heel walk with no ataxia); 12/11/12 visit with Weitzenberg  (AR 785) (observing that Hoffschneider had full active range of motion without significant pain; a normal gait, toe, heel walk, no ataxia, and was a positive on the right for a straight-leg raise); 5/23/13 visit with Berg  (AR 826) (observing that while there was pain from Hoffschneider 's lower back (lumbar) into his legs posteriorally, Hoffschneider did not complain of any muscle weakness and his gait was normal); 6/13/13 visit with Berg (AR 823) (observing that while Hoffschneider's "patellar reflexes were 'non-existent,'" his ankle reflexes were "1-2+" and the muscle strength of his lower extremities was 4/4); 7/25/13 visit with Berg (AR 820) (observing that there was "no bony tenderness" and "no muscle spasms" in Hoffschneider's back, Hoffschneider had a full range of motion, a negative straight leg raise test, Hoffschneider's station and gait were normal, the reflex testing was symmetrical, and the special sensory examination was "grossly normal").

*Second*, Hoffschneider mischaracterizes Khari's opinion.  Khari did not opine that he was disabled.  Instead, Khari opined that it was going to be "difficult for [Hoffschneider ] to be gainfully employed."  To the extent that Hoffschneider contends that the ALJ was required to address this opinion, the error, if any, is harmless because Khari's opinion is vague and

incomplete.  Khari does not explain what he means by the statement "gainfully employed" or why he believes this to be so.  Moreover, since Khari did not provide an assessment of his functional capabilities, it is unclear how ALJ could have meaningfully evaluated this opinion.  *See, e.g., Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (explaining that the ALJ "may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings"); *see also Aruwah v. Berryhill*, No. 16-CV-02315-DMR, 2017 WL 3670789, at *13 (N.D. Cal. Aug. 25, 2017) (finding the ALJ "properly rejected [a treating physician's opinion] that the plaintiff was unable to work due to her medical condition because it was conclusory, and failed to provide the bases for his conclusion or any information on the plaintiff's functional limitations") (citing *Burrell*, 775 F.3d at 1140).

### d. Additional Specialists Not Discussed by ALJ

Hoffschneider argues that the ALJ erred in failing to discuss the opinions of radiologists Smith and Lindee, orthopedic surgeon Slucky, and neurosurgeons Guppy and Hunstock.  *See* AR 239, 357, 375, 552, 804.  According to Hoffschneider, the ALJ was required to address these opinions because these specialists found that he had no residual functional capacity and their findings are entitled to more weight than non-specialists.  This is incorrect for several reasons.

*First*, Hoffschneider mischaracterizes the record.  None of these providers opined that he had "no residual functional capacity."  In fact, none of these providers offered any opinions on his functional limitations, or provided evidence that was not otherwise cumulative of other evidence in the record.  Regarding Smith and Lindee, Smith simply interpreted a December 2009 MRI of Hoffschneider's lumbar spine and observed that there was "no significant change" from a prior 2008 MRI.  AR 735.  Likewise, Lindee interpreted 2010 and 2012 MRIs of his lumbar spine and opined there were no significant changes from each MRI.  AR 427 (2010 MRI); AR 555 (2012 MRI).  Regarding orthopedic surgeon Slucky, Slucky offered no opinions on his functional limitations at any visit.  For example, at a December 2009 visit, his notes reflect that Hoffschneider reported that he could only walk for less than 2 blocks and could sit for no more than 30 minutes.  AR 239.  On March 29, 2010, Slucky noted that Hoffschneider's sciatica had resolved, but that he still had baseline lower back pain.  AR 349.  Accordingly, Slucky

recommended that he continue self-directed physical therapy/aerobics. AR 349. On September 2,

2011, Slucky observed that his gait was within normal limits and his alignment was upright and

centered. AR 353. He opined that there was no evidence of segmental instability or neurologic

compromise/complaint, there were "no spinal surgery indications" and that he expected

Hoffschneider to resume activities as tolerated. AR 353. Lastly, regarding neurosurgeons

Hunstock and Guppy, each provider only saw Hoffschneider on one occasion and opined that

further surgery was not necessary. *See, e.g.*, 9/9/11 visit with Guppy (AR 357) (opining that the

"role of surgery" for lower back pain such as that demonstrated by Hoffschneider was

"controversial especially [without] evidence of instability," Hoffschneider needed to be treated

conservatively with epidurals, and fusion surgery at L5-S1 carried a 50/50 success rate); 7/1/13

visit with Hunstock (AR 806) (opining that "further surgery at L5-S1 would not guarantee any

improvement" over and above where Hoffschneider was at that point).

*Second*, contrary to what Hoffschneider argues, the ALJ did discuss the findings of the

9/2/11 visit with Slucky and the 9/9/11 visit with Guppy in the review of the medical evidence.

*See* AR 17 (citing and discussing Exhibit 1F/119 (9/2/11 visit with Slucky) and Exhibit 2F/3-4

(9/9/11 visit with Guppy). While Hoffschneider is correct that the SSA "generally give[s] more

weight to the medical opinion of a specialist about medical issues related to his or her area of

specialty than to the medical opinion of a source who is not a specialist," 20 C.F.R.

§ 416.927(c)(5), *Reed v. Massanari*, 270 F.3d 838, 845 (9th Cir. 2001), any failure of the ALJ to

do so here was harmless because neither of these specialists, or any other specialist, offered any

opinions on Hoffschneider's functional limitations. Additionally, as discussed above, the opinions

the specialists offered regarding the degree of Hoffschneider's impairments were cumulative of

other medical evidence in the record.

*Third*, to the extent that Hoffschneider contends that the ALJ was required to discuss every

provider or every record documenting the severity of his back issues, he is incorrect. *See, e.g.*,

*Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (explaining that "the ALJ does not need

to discuss every piece of evidence," and the "ALJ is not required to discuss evidence that is neither

significant nor probative") (citation and quotation marks omitted). Hoffschneider does not

1   demonstrate how the findings of any of these specialists were significant or probative of his

2   functional capability, or were not cumulative of other evidence in the record regarding the severity

3   of his back issues.  Instead, he merely recites select portions of their findings and posits his own

4   interpretation of their significance.  As discussed, even if the evidence is possibly susceptible to

5   more than one conclusion, the court cannot substitute its judgment for that of the ALJ.  *See*

6   *Jamerson*, 112 F.3d at 1066.

7         In his reply, Hoffschneider argues, for the first time, that the ALJ also failed to address the

8   May 2012 opinion of treating physician Weitzenberg in which he stated that he did not

9   recommend a rhizotomy.  Although the court need not consider an argument raised for the first

10  time on reply, *see Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990) ("It is well

11  established in this circuit that [t]he general rule is that appellants cannot raise a new issue for the

12  first time in their reply briefs.") (citation and internal quotations marks omitted), the court will

13  nonetheless address it.

14        As with the other specialists, Hoffschneider fails to explain how Weitzenberg's May 2012

15  opinion is significant or probative of his functional capacity.  On May 22, 2012, Weitzenberg did

16  not offer any opinions on his functional capacity.  Instead, he told Hoffschneider during a

17  telephonic phone consult that he did not recommend a rhizotomy based on his poor response to the

18  steroid injections and medial branch blocks, but also noted that Hoffschneider had declined to

19  participate in the chronic pain program.  AR 705.  To the extent that this opinion is probative of

20  the severity of Hoffschneider's back condition and should have been discussed, any error is

21  harmless as the evidence is cumulative.  Additionally, to the extent that Hoffschneider contends

22  that this opinion is evidence of his disability, he fails to unpack his argument, let alone support it

23  with other evidence in the record.

24        In conclusion, the ALJ did not err in failing to address the findings of other specialists.

25        **B.  The ALJ's Step 3 Evaluation**

26        At Step 3, the ALJ considered Hoffschneider's impairment (post-laminectomy syndrome

27  of lumbar) and found that it did not meet or equal the severity of an impairment listed in Listing

28  1.04.  AR 15.

26

Listing 1.04 requires a disorder of the spine (for example, spinal stenosis or degenerative disc disease) "resulting in compromise of a nerve root . . . or the spinal cord," with:

> [1] [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, [2] limitation of motion of the spine, [3] motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, [4] if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1.

Under the Social Security regulations, to meet the requirements of a listing, a claimant "must have a medically determinable impairment[ ] that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525; *Sullivan v. Zebley*, 493 U.S. 521, 530 ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). "[I]n determining whether a claimant equals a listing under step three of the Secretary's disability evaluation process, the ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments." *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990)[6]. However, the ALJ does not need to "specify [its findings] under the heading "Findings." *Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001). The ALJ is "simply require[d] . . . to discuss and evaluate the evidence that supports his or her conclusion." *Id.* (*Marcia* simply requires an ALJ to discuss and evaluate the evidence that supports his or her conclusion; it does not specify that the ALJ must do so under the heading 'Findings.'").

Hoffschneider argues that the ALJ erred by not discussing the medical evidence that showed that he met or equaled Section 1.04. He also contends that he met Listing 1.04 and points to evidence including (a) a 2012 MRI interpreted by Lindee that showed a "stable broad-based disc protrusion" and a "stable adjacent enhancing scar encasing the right S1 nerve root within the

---

[6] Hoffschneider contends that the Ninth Circuit has not spoken on the issue of the type of analysis the ALJ must provide at Step 3, and then cites to three cases from the Seventh Circuit. *See, e.g.,* *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783 (7th Cir. 2002); *Scott v. Barnhart*, 297 F.3d 589 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 935 (7th Cir. 2002). This is incorrect. As discussed above, in *Marcia*, the Ninth Circuit explained what type of analysis the ALJ must perform to support his or her conclusion at Step 3.

lateral recess," AR 552; (b) a 2009 MRI study interpreted by Dr. Smith that showed a "degenerative changes of [the] lower lumbar spine" and "[s]table right posterolateral disk protrusion at L5-S1, displacing the traversing nerve root," AR 375; and (c) reports from Guppy, Botehlo, and Khari describing his pain. His argument is unpersuasive for several reasons.

*First*, while Hoffschneider is correct that the ALJ did not specifically discuss the reasons for the Step 3 conclusion, the ALJ discussed the evidence in subsequent paragraphs. *See Holguin v. Berryhill*, No. 16-CV-06479-HRL, 2017 WL 3033672, at *4 (N.D. Cal. July 18, 2017) (no reversible error where ALJ discussed medical evidence supporting his conclusion that the claimant's condition did not meet or equal Listing 1.04 in paragraphs following his Step 3 conclusion); *see also Gaston v. Comm'r of Soc. Sec. Admin.*, 577 F. App'x 739, 741 (9th Cir. 2014) (explaining that "although the ALJ's conclusion regarding the medical equivalence of [the claimant's] impairments was stated in a summary fashion, the ALJ was not required to provide an in-depth equivalency analysis because [the claimant ] did not present medical evidence showing that his knee impairment, or his shoulder and knee impairments taken together, medically equal Listing 1.02A or any other listing") (citing *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005)).

The ALJ first described imaging showing evidence of a qualifying spine disorder under Listing 1.04. Specifically, the ALJ noted that X-rays and a 2010 MRI demonstrated degenerative disc disease at L4-S1 and some compression of the right S1 nerve root due to some residual/recurrent disc. AR 17; *see also* AR 555 (2010 MRI interpreted by Lindee) (finding "stable broad-based disc protrusion, lateralizing to the right" and "stable adjacent enhancing scar encasing the right S1 nerve root within the lateral recess," but "no significant foraminal encroachment").

The ALJ then discussed the examination notes of Dr. Timothy John Regan, Slucky, Guppy, and Weitzenberg. None of these document any limitation of range of motion, motor loss, muscle weakness, or sensory or reflex loss. AR 16 (citing to Exhibit 3F/90 (7/8/11 Regan visit), Exhibit 1F/119 (9/2/11 Slucky visit), Exhibit 2F/3-4 (9/9/11 Guppy visit), and Exhibit 3F/399 (12/11/12 Weitzenberg visit); *see also* 7/8/11 visit with Regan (AR 449) (observing that there was no costovertebral angle tenderness in Hoffschneider's back, his lower back was nontender, and he

28

had good range of motion)[7]; 9/2/11 visit with Slucky (AR 353) (noting that Hoffschneider's gait was within normal limits, his alignment was upright and centered, and that he denied any leg pain, spontaneous loss of bowel or bladder control); 9/9/11 visit with Guppy (AR 356) (indicating that Hoffschneider did not have any numbness, tingling, or radiation, as well as any bowel bladder problems); 12/11/12 visit with Weitzenberg (AR 758) (reporting that Hoffschneider had full active range of motion without significant pain and a normal gait, toe, heel walk, no ataxia, and a positive straight leg raise on the right).

_Second_, there is no evidence that Hoffschneider's condition met Listing 1.04 because, as discussed, there is little evidence that he suffered from motor loss (atrophy with associated muscle weakness or muscle weakness), or sensory or reflex loss. As described above, the record is replete with instances where he denied these symptoms. *See supra* at 32; *see also* 11/4/11 visit with Weitzenberg (AR 478) (denying significant numbness, tingling, weakness, bowel or bladder symptoms, or perineal paresthesias); May 23, 2013 visit with Berg (AR 826) (observing that Hoffschneider did not complain of any muscle weakness and his gait was normal); 6/13/13 visit with Berg (AR 823) (observing that while his "patellar reflexes were 'non-existent,'" his ankle reflexes were "1-2+" and the muscle strength of his lower extremities was 4/4); 7/25/13 visit with Berg (AR 820) (observing that there was "no bony tenderness" and "no muscle spasms" in his back, there was full range of motion, a negative straight leg raise test, his station and gait were normal, the reflex testing was symmetrical, and the special sensory examination was "grossly normal"); 6/26/14 visit with Khari (AR 837) (noting that his reflexes seemed to be intact and normal on one side and that his gait pattern was within normal limits). While there are instances of impaired reflexes, and limited mobility in the record that might support a Listing 1.04 finding,[8] the court cannot substitute its judgment for that of the ALJ. *See Jamerson*, 112 F.3d at 1066

---

[7] Hoffschneider argues that the findings from the 7/8/11 visit with Regan should be given less weight because he was not examined for a back-related injury. However, it is the ALJ, not this court, who is tasked with weighing the evidence. *See Reddick*, 157 F.3d at 722.

[8] *See, e.g.*, 7/25/13 visit with Berg (AR 820); 7/1/13 visit with Hunstock (AR 806) (noting that his lumbar mechanics were "significantly limited to about 30% of normal in all directions" . . . ); 8/29/12 visit with Green (AR 744) (observing that his back had limited range of motion with flexion and bilaterally had a negative straight-leg raise).

29

1   (explaining that if the evidence reasonably could support two conclusions, the court "may not

2   substitute its judgment for that of the Commissioner" and must affirm the decision).

3          Lastly, Hoffschneider contends that the examination notes from the 9/9/11 visit with

4   Guppy, the 12/12/13 visit with Botehlo, and the 6/26/14 visit with Khari document his limitation

5   of motion, muscle weakness, and sensory or reflex loss. He overstates the evidence. In fact, some

6   of those records indicate the opposite. *See, e.g.*, 9/9/11 visit with Guppy (AR 356) observing that

7   although Hoffschneider reported pain across his lower back, that he did not have any numbness,

8   tingling, or radiation, as well as any bowel bladder problems); 12/12/13 visit with Botehlo (AR

9   832) (upon a physical examination, there was "symmetric bulk, tone, and strength" in his reflexes

10  were patellar 2+ and achilles 2+ symmetric); 6/26/14 visit with Khari (AR 837) (noting that his

11  reflexes seemed to be intact and normal on one side and his gait pattern was within normal limits).

12         To the extent that Hoffschneider contends that his impairments equal Listing 1.04 due to

13  chronic pain as documented by Guppy, Botehlo, and Khari, taken together with degenerative disc

14  disease, his argument is unsupported. He only states in conclusory fashion that his "neuro-

15  anatomic distribution of pain" as purportedly diagnosed by Guppy, Botehlo, and Khari limits his

16  motion and has resulted in muscle weakness and sensory loss. But, as discussed, there is little

17  medical evidence to support this statement. *See, e.g., Cattano v. Berryhill*, 686 F. App'x 408, 410

18  (9th Cir. 2017) (explaining that the claimant "did not meet all of the requirements for Listing 1.04,

19  for disorders of the spine, because he is unable to point to evidence that he has suffered motor

20  loss, sensory or reflex loss, or positive straight-leg raising tests in the sitting and supine positions

21  for twelve continuous months").

22         Therefore, the ALJ did not err in concluding that Hoffschneider's impairment did not met

23  or equal Listing 1.04 at Step 3.

24  **C. The ALJ's Evaluation of Hoffschneider's Credibility**

25         Hoffschneider argues that the ALJ erred in assessing his credibility.

26         **1.      Legal Standards**

27         In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to

28  resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the

ALJ's conclusion must be upheld." *Allen v. Sec'y of Health & Human Servs*., 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted). An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)). However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id*. at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted). Absent affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The Ninth Circuit has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's decision to reject a claimant's testimony. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir.

2014).

## 2. Analysis

The ALJ found that Hoffschneider's "medically determinable impairments reasonably could be expected to cause the alleged symptoms," but determined that his "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." AR 16, 18. According to the ALJ, while Hoffschneider received various forms of treatment for his allegedly disabling symptoms, the record also demonstrated that the treatment was generally successfully in controlling his symptoms. AR 18. Additionally, the ALJ observed that while Hoffschneider had been prescribed medications for his alleged impairments, the record demonstrated that the medication had been relatively effective in controlling his symptoms. AR 18. Finally, the ALJ noted that Hoffschneider had admitted "certain abilities" that provided support for the part of the determination that he had residual functional capacity to work. AR 18.

Hoffschneider challenges the ALJ's credibility assessment in three ways, none of which are persuasive.

Hoffschneider first argues that the ALJ erred in failing to address his pain as required by SSR 16-3p. SSR 16-3p eliminates language relating to a claimant's credibility, and directs the ALJ to consider a "subjective symptom evaluation" which "is not an examination of an individual's character, but rather is an evidence-based analysis of the administrative record to determine whether the nature, intensity, frequency, or severity of an individual's symptoms impact his or her ability to work." SSR 16-3p. The Commissioner disagrees, arguing that SSP 16-3p only applies to cases decided on or after its effective date of March 28, 2016. According to the Commissioner, because the ALJ's decision was issued before March 28, 2016, SSR 96-7 applies. Under SSR 96-7p, the ALJ's credibility findings "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.[9]

The court notes that there is no binding authority in this circuit on whether SSR 16-3p

---

[9] The court notes that the parties did not point the court to any authority to support their respective positions.

United States District Court
Northern District of California

applies retroactively. A handful of district courts have concluded that SSR 16-3p does not apply retroactively. *See, e.g., Wright v. Colvin*, No. 15-CV-02495-BLF, 2017 WL 697542, at *9 (N.D. Cal. Feb. 22, 2017) (finding that SSR 16-3p did not apply retroactively to the ALJ's decision and was not a reason to reverse the ALJ's evaluation of the claimant's testimony); *Ferguson v. Berryhill*, No. 17-CV-01491-MEJ, 2017 WL 6450486, at *12 (N.D. Cal. Dec. 18, 2017) (finding that "SSR 96-7p applies to the Court's review of the ALJ's decision, which was issued before March 16, 2016"); *see also Lemus v. Berryhill*, No. 16-CV-06163-RS, 2018 WL 534296, at *3 (N.D. Cal. Jan. 24, 2018) ("[B]ecause SSR 96-7p was in effect at the time the ALJ made his decision, SSR 96-7p governs this analysis"). However, at least two district courts have suggested SSR 16-3p could apply retroactively. *See, e.g., Sherrard v. Colvin*, No. 16-CV-02353-EMC, 2017 WL 878063, at *8, n.6 (N.D. Cal. Mar. 6, 2017) (collecting cases) (observing, in dicta, that "SSR 16-3p likely applies retroactively because it is a simply a clarification of an existing rule rather than a new rule"); *Mesecher v. Colvin*, No. 6:14-CV-01578-JE, 2016 WL 6666800, at *4 (D. Or. Nov. 10, 2016) (applying SSR 16-3p to pre-March 2016 ALJ decision).

Having carefully reviewed the record, and for the reasons discussed above, the court finds that it need not resolve this issue because the ALJ properly evaluated Hoffschneider's subjective complaints of pain and impairments against the medical evidence in the record, and did not impermissibly focus on his character. Specifically, the ALJ correctly observed that while Hoffschneider received various forms of treatment for his allegedly disabling symptoms, which would normally weigh in his favor, the record also demonstrated that the treatment was generally successfully in controlling his symptoms. AR 18. For example, at the October 2, 2013, Berg noted that Hoffschneider felt that his pain was controlled. AR 815. By September 2014, Hoffschneider reported that his current pain medication regimen was controlling his pain. AR 868. In March and April 2015, he indicated that his pain remained controlled, and that his medication plan was working well, and that he had no request to change it. AR 842 (3/11/15 visit); AR 839 (4/8/15 visit ). Similarly, the ALJ also noted that while Hoffschneider had been prescribed medications for his impairment, the record demonstrated that the medication had been relatively effective in controlling his symptoms. AR 18. As discussed above, Hoffschneider's pain started

getting under control in 2013, and remained controlled as of April 2015. *See* AR 815, 839, 842, 868. Furthermore, the ALJ specifically acknowledged that Hoffschneider had "significant symptoms from back and right leg pain" and noted that she took these symptoms, along with his "subjective complaints, side effects of medications and the actual clinical and diagnostic findings," into consideration when she adopted limitations that were "more restrictive than any medical opinion . . . ." *Id*. The ALJ's statement is supported by the record. For instance, the ALJ specified in the RFC that Hoffschneider would be off task 5% of the time due to pain and that he must alternate positions every 20 minutes. AR 15. No medical provider opined that Hoffschneider would be off task any percentage of time due to pain.

Hoffschneider next argues that the ALJ erred in citing to selective portions of the record where his pain symptoms were in remission. For example, the ALJ cited to a July 18, 2011 visit where Regan reported that Hoffschneider's back showed no CVA tenderness or deformity. AR 16; *see also* AR 449. According to Hoffschneider, his symptoms were in remission from February 2011 until November 2011, when his pain returned, and that his pain was the worst it had ever been by January 3, 2014.

Hoffschneider mischaracterizes the ALJ's decision and the record. The ALJ considered the fluctuations in Hoffschneider's symptoms over time which document the subsidence and return of pain. The ALJ properly observed that the overall arc of his medical treatment showed that his pain was generally controlled by his pain management regimen. For starters, the ALJ discussed the fact that Hoffschneider's 2011 epidural injection and his 2012 bilateral L5-S1 facet joint injections and bilateral L5-S1 medial branch block injections provided little to no relief for his lower back pain. AR 17; *see also* 12/5/11 e-mail to Weitzenberg (AR 512) (Hoffschneider stating that he had no relief from pain after the 11/7/11 fluoroscopic spinal injection of the right L4-5 vertebrae); 4/11/12 e-mail to Weitzenberg (AR 606-16) (stating that he did not experience much relief from 3/26/12 fluoroscopic bilateral L5-S1 facet joint injection); 5/22/12 telephonic consult with Weitzenberg (AR 704-05) (reporting that he experienced one day of pain relief after 4/30/12 medial branch block injection, but no significant improvement).

The ALJ then accurately noted that from 2013 onward, the medical evidence showed that

his pain was generally controlled with pain medications.

Specifically, in 2013, Berg observed that Plaintiff's pain was gradually getting under control. *See, e.g.*, 6/13/13 visit (AR 823) (noting that Hoffschneider recently started on MS Contin and "thinks that MS [Contin] may be working OK" and that the referral to Botehlo for pain management "is going well"); 7/25/13 visit (AR 820) (noting that he was taking Oxycontin 15mg every 8 hours and "feeling better," was "hardly using any Norco, and was seeing Botehlo who was considering implanting a Medtronic nerve stimulator to reduce his pain and continuing him on MS Contin, which she observed "seem[ed] to be working well"); 9/25/13 visit (AR 817) (indicating that Medtronic neural stimulator was "helping" with his pain, but "pain is not adequately controlled yet"); 10/2/13 visit (AR 815) (indicating that Hoffschneider was still having pain in the area of the battery pack, but "in general" felt the pain was "controlled"). Similarly, in 2013, Botehlo noted that the neural stimulator helped with Hoffschneider's symptoms. *See, e.g.*, 9/11/13 visit (AR 833, 835) (using the neural stimulator more frequently, and had "no complaints" and noting that Hoffschneider was "doing well with improved programs"); 12/13/13 visit (AR 830) (noting that the neural stimulator "continue[d] to help" and Hoffschneider was using it constantly and he was "stable").

In 2014 and 2015, Wheeler reported that Hoffschneider's pain medication plan was working well and his pain was controlled. *See, e.g.*, 9/15/14 visit (AR 868) (reporting that his medication pain was working well and that he had no request to change it.); 1/1/15 visit (AR 852) (reporting that he was stable on his current dose of pain medication and had improved functionality and "good pain control" on his current pain regimen.); 3/11/15 visit (AR 842) ("Pain remains controlled."); 4/8/15 visit (AR 839) ("Medication Plan: Working well, no request to change.").

Hoffschneider lastly argues that the ALJ erred in failing to specify what "certain abilities" he possessed that support the RFC finding. While it is unclear what abilities the ALJ was referring, (AR 18), the failure to specify these abilities was harmless error. There is at least some evidence in the record showing that Hoffschneider possessed a greater level of functionality than he claimed. For example, in October 2013, he reported to Berg that he was not going to the gym

because he was taking care of his youngest child while his wife underwent a procedure.  AR 815.

Moreover, as discussed above, the ALJ properly assessed the overall medical evidence in the record including his subjective complaints in concluding that that he was not disabled.

Therefore, the ALJ did not error in the assessment of Hoffschneider's credibility.

**D.  The ALJ's Evaluation at Step 5**

Although unclear, Hoffschneider appears to argue that the ALJ erred at Step 5 by (1) failing to make allowances for his pain and (2) failing to otherwise address other evidence regarding the severity in questions to the VE and the formulation of the RFC.  However, as discussed above, the ALJ properly discounted his subjective complaints of pain, and properly weighed the medical evidence in finding that Plaintiff was not disabled.  Accordingly, the ALJ was not required to include Hoffschneider's complaints of pain, discounted medical opinions or other medical evidence that did not have any bearing on his overall functionality, in questions to the VE and the formulation of the RFC.  *See, e.g.*, *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175–76 (9th Cir. 2008) (finding no error at Step 5 where, in arguing that the "ALJ's hypothetical was incomplete, [the claimant] simply restates her argument that the ALJ's RFC finding did not account for all her limitations because the ALJ improperly discounted her testimony and the testimony of medical experts"); *Batson v. Comm'r of Soc. Sec. Admi*n., 359 F.3d 1190, 1197 (9th Cir. 2004) (finding that the "ALJ was not required to incorporate evidence from the opinions of [the claimant's] treating physicians, which were permissibly discounted").

**E.  The ALJ's Duty to Develop the Record**

Although unclear, Hoffschneider appears to argue that the ALJ erred in failing to further develop the record with respect to his pain management.  According to Hoffschneider, the ALJ was required to contact Botehlo for additional records or ask him if he attended a pain management program.  His argument is unpersuasive.  There are medical records from Botehlo, a pain management specialist, showing he underwent pain management treatment in September and December 2013.  AR 830-35.  To the extent that Hoffschneider contends that the ALJ was required to obtain additional records, he does not specify what additional treatment he underwent that would be relevant to the issues on appeal here.  Nor does he cite to any evidence or authorities

1    to support his request.

2    **F. Credit-As-True**

3    Hoffschneider asks the court to issue an order for payment of benefits, rather than remand

4 the case to the ALJ to conduct further proceedings. Since the court finds no error in the ALJ's

5 decision, it denies his request for an order for payment of benefits.

6 **VII.   CONCLUSION**

7    In conclusion, the court denies Hoffschneider's motion and grants the Commissioner's

8 cross-motion.

9

10    **IT IS SO ORDERED.**

11 Dated: March 19, 2018



IT IS SO ORDERED

Donna M. Ryu
United States Magistrate Judge
Judge Donna M. Ryu